Larry J. Lichtenegger, Esq. [CSB #048206]
The Lichtenegger Law Office
3850 Rio Road, #58
Carmel, CA 93923
Telephone: (831) 626-2801
Facsimile: (831) 886-1639
lawyer@mbay.net

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESTIGE INDUSTRIES, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>APPLIED UNDERWRITERS, INC., a Nebraska corporation, APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC., an Iowa corporation; CONTINENTAL INDEMNITY COMPANY, an Iowa corporation; APPLIED RISK SERVICES, INC., a New York corporation; LOCKTON COMPANIES, LLC – PACIFIC SERIES d/b/a LOCKTON INSURANCE BROKERS, LLC f/k/a SOUTHERN CALIFORNIA SERIES OF LOCKTON COMPANIES, LLC d/b/a LOCKTON INSURANCE BROKERS, LLC, an Illinois series limited liability company; and DOES I through 50, inclusive,<br><br>Defendants. | Case No. 2:16-cv-00312-JAK-AGR<br><br>FIRST AMENDED COMPLAINT FOR:<br>1. Declaratory Relief & Rescission<br>2. Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing<br>3. Fraud & Misrepresentation<br>4. Professional Negligence<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff alleges as follows:

1. Plaintiff Prestige Industries, LLC (herein "Prestige" or "Plaintiff") is a Delaware limited liability company with its principal place of business in Lyndhurst, New Jersey, and at all times herein was doing business in the States of New Jersey and New York. Prestige is owned and operated by St. Cloud Capital, LLC.

2. On information and belief, Defendant Applied Underwriters, Inc. (herein "Applied") is

1   a Nebraska corporation, and at all times herein was doing business in the State of California. On

2   information and belief, Applied is a member of the Berkshire Hathaway Group and a corporate

3   affiliate of the other Berkshire Hathaway affiliate defendants.

4        3. On information and belief, Defendant Applied Underwriters Captive Risk Assurance

5   Company, Inc. ("AUCRA") is an Iowa corporation with a principle place of business in Nebraska.

6   At all times referenced herein, AUCRA was, and is, authorized to do business in the State of

7   California as a property and casualty insurer, including workers' compensation insurance. On

8   information and belief, AUCRA is a member of the Berkshire Hathaway Group and a corporate

9   affiliate of the other Berkshire Hathaway affiliate defendants.

10        4. On information and belief, Defendant Continental Indemnity Company ("Continental"),

11   is a company organized under the laws of the State of Iowa, with a principal place of business in

12   Nebraska. At all times referenced herein Continental is, and was, authorized to do business in the

13   States of California, New Jersey and New York. On information and belief, Continental is a

14   member of the Berkshire Hathaway Group and is a corporate affiliate of the other Berkshire

15   Hathaway affiliate defendants.

16        5. On information and belief, Defendant Applied Risk Services, Inc. ("Applied Risk") is a

17   company organized under the laws of the State of New York, with a principal place of business in

18   Nebraska. On information and belief, Applied Risk is a member of the Berkshire Hathaway

19   Group and is a corporate affiliate of Applied Underwriters and other Berkshire Hathaway affiliate

20   defendants.

21        6. On information and belief, Defendant Lockton Companies, LLC – Pacific Series d/b/a

22   Lockton Insurance Brokers, LLC f/k/a Southern California Series of Lockton Companies, LLC

23   d/b/a Lockton Insurance Brokers, LLC  (herein "Lockton"), is an Illinois series limited liability

24   company, and has its principal place of business in Kansas City, Missouri. At all times referenced

25   herein, Lockton is, and was, authorized to transact business in the State of California with a place

26   of business in Los Angeles, California..

27        7. [Deleted]

28        8. The true names and capacities, whether individual, corporate, associate or otherwise, of

1   the defendants named herein as Does 1 through 50, inclusive, are unknown to Prestige and

2   therefore sues said defendants by fictitious names. Prestige will amend this Complaint when their

3   true names and capacities have been ascertained. Each of the defendants named herein, whether

4   their identities are known or unknown, is in some manner responsible for the acts, events, and

5   occurrences described, either jointly or severally, and is in some manner liable for equitable relief

6   to Prestige.

7       9. Prestige is informed and believes, and upon such information and belief alleges, that all

8   defendants in this action, including those Doe Defendants 1-50, inclusive, are individuals,

9   corporations or business associations which are and were at all times referenced herein acting as

10  agents, servants, contractors, partners, joint ventures, alter egos, successors in interest, or

11  employees of other defendants herein and were authorized to act for and/or on behalf of said

12  defendants, and each of them, with the express and/or implied permission, knowledge, consent

13  and ratification of all said defendants.

14      10. For purposes of convenience and where appropriate, Applied, AUCRA, Applied Risk,

15  and Continental will be referred to collectively herein as "Applied" or "the Applied Defendants."

16      11. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a),

17  inasmuch as complete diversity of citizenship exists between the parties and the amount in

18  controversy is in excess of $75,000.00.

19      12. Pursuant to 28 U.S.C. § 2201(a), this court may declare the rights and other legal

20  relations between Prestige and Applied Underwriters that are in actual controversy.

21      13. Venue is proper in the Central District of California pursuant to 28 U.S.C.

22  §1391(b), as a substantial part of the events giving rise to the claims in this action occurred

23  in this District.

24                          **GENERAL ALLEGATIONS**

25      14. Lockton served as an insurance broker to St. Cloud Capital to procure workers'

26  compensation policies for Prestige. All representations/misrepresentations during the negotiations

27  and submission of proposals surrounding the execution of the contracts referred to herein

28  occurred in Los Angeles, California. In or around October 2013, Lockton provided St. Cloud

Capital with various quotes and proposals for workers' compensation policies, including a quote from the Applied Defendants. Specifically, Lockton and the Applied Defendants represented to St. Cloud Capital that the minimum annual cost of workers' compensation to insure Prestige through the EquityComp program would amount to $506,596 annually, and $1,519,789 over three years (if no claims were filed) and the maximum annual cost would be $1,872,549 annually, and $5,617,646 over three years. Lockton further advised that Applied's workers' compensation policies were far less expensive than coverage from any of Applied's competitors.

15. Applied and Lockton also represented that the proposals, called the EquityComp program, was a loss sensitive program and that the lower the loss claims, the lower premium costs could be achieved during the three year term of the agreement. The program was represented as a "profit sharing plan" whereby the insured would receive back a portion of the premiums paid based on lower than expected losses and could potentially reach as low as 0.35% of the scheduled Loss Pick Containment Amounts which formed the basis of the premium calculations. Applied and Lockton represented that the lower the losses the closer to the 0.35% the insured could achieve. Prestige was assigned, in Applied's Proposals, with an initial 0.70 Pay-In Factor by which its premiums would be calculated which was to go up or down based on losses.

16. Believing these representations to be true, on October 29, 2013, Prestige executed a formal "Request to Bind" coverage with the Applied Defendants. On October 30, 2013, Prestige executed a "Reinsurance Participation Agreement (herein the "RPA") and thereby agreed to and did contract with the Applied Defendants for a three-year workers' compensation insurance policy based upon Lockton and the Applied Defendant's representations. The three-year policy was to run from October 30, 2013 through October 29, 2016.

**THE REINSURANCE PARTICIPATION AGREEMENT ("RPA")**

17. On or around October 30, 2013, St. Cloud and Prestige was provided with a copy of Applied Underwriters' "Reinsurance Participation Agreement" ("RPA"). A true and correct copy of the RPA is attached hereto as Exhibit A, and by this reference is incorporated herein. The RPA bore several hallmarks of an adhesion contract and was presented to Prestige unilaterally, on a "take it or leave it" basis.

18. The RPA as a whole contains numerous requirements that unreasonably favor the Applied Defendants and are otherwise adhesive, ambiguous and uncertain, one-sided and collectively unconscionable. Among these provisions, the RPA:

Fails to fully disclose the Applied Defendants' methods for calculating premium, rates, any other factors to determine amounts due to AUCRA and the Applied Defendants (Paragraphs 1, 2, 3 & 4 of Schedule I);

Fails to fully disclose in any manner the Applied Defendants' methods for calculating the profit sharing aspect of the EquityComp program (Paragraph 5 of Schedule I)

Fails to fully disclose or clearly explain the Applied Defendants' methods for calculating early cancellation fees (Paragraph 6 of Schedule I)

Contains unconscionable loss development factors (Table A of Schedule I);

Contains unconscionable Exposure Group Adjustment factors (Table B of Schedule I);

19. Under the terms of cancellation, even if a policyholder such as Prestige, believes the computations being issued by the Applied Defendants are erroneous, oppressive, or otherwise unreasonable, and Prestige seeks to cancel the agreement because of this fraud, mismanagement and/or clearly erroneous or unexplained billing, Paragraph 6 of the RPA imposes penalty type clauses such that a cancellation results in higher profits for the Applied Defendants or higher costs to Prestige if they are the party initiating the cancellation themselves. Specifically, paragraph 6 provides, in part:

"In the event of Early Cancellation whether by Participant or by the Company (limited to non-pay or a material change in risk): (a) the Exposure Group Adjustment Factor will by multiplied by 1.25; (b) the Cumulative Aggregate Limit will be determined using Policy Payroll annualized to reflect the full term of the Agreement; and (c) the following amounts will be immediately due and payable to the Company: i) any remaining premium, including short rate penalties, due under the Policies; ii) a capital deposit equal to the cell's maximum liability; and iii) a Cancellation Fee equal to 8% of the Estimated Annual Loss Pick Containment Amount.

20. On information and belief, the RPA has never been submitted for approval to the appropriate insurance regulatory agencies of California, New Jersey or New York. The RPA is required to be filed and approved by these regulatory agencies because it alters the payment requirements under the Continental policies. In short, what Prestige was required to pay did not match the premium requirements under the Continental policies. The Applied Defendants claim they are able to avoid the filing requirements, pursuant to an agreement between them, by having

Defendant Applied Risk Services make up any deficiency in the payments due Continental by advancing funds to Continental to make up the shortfall. Continental is then able to show on its books that it receives all of its premiums, and the relevant regulatory agencies are not able to catch this shortfall because it does not audit the books of Applied Risk Services. All the regulatory agencies see are that Continental receives all of its premiums. This conspiratorial scheme was set up by Applied Underwriters, Inc. to fool the regulatory agencies and not ask questions about the RPA. This conspiratorial conduct makes all the Applied Defendants responsible to plaintiff for the damages it claims herein.

**THE APPLIED DEFENDANTS' CONDUCT**

21. Beginning in early 2014 and continuing to November 2015, Prestige realized that its premiums continued to increase, sometimes dramatically, just over the course of a few months. Prestige called Applied Underwriters many times during this period to request an explanation. At such times, Applied Underwriters would forward Prestige to "customer service," who had little working knowledge of the EquityComp Program, the methods for calculating the monthly statements, or the underlying basis for the rates applied in the monthly statements. Alternatively, when Prestige e-mailed Applied Underwriters to obtain an explanation for the sharp increases in premium, Applied Underwriters often failed to meaningfully respond or provide a substantive explanation. Instead, Applied Underwriters' representatives would simply re-send a monthly plan statement or loss runs for the applicable period.

22. During this period, Prestige also contacted Lockton to see if it could explain the dramatic and abrupt increases in Prestige's premiums under the EquityComp Program. Lockton assured Prestige that it would contact Applied Underwriters to obtain an explanation for the rate increases. However, at no time did Lockton obtain an intelligible or comprehensive explanation. Indeed, Lockton rarely, if at all, went back to the initial calculations Applied Underwriters and the Applied Defendants provided Prestige before it signed onto the EquityComp Program or met with Prestige to review the EquityComp Program, the RPA, or any other documents to ascertain the basis for the rate increases.

23. By November 2015, Prestige's actual loss ratio (incurred losses over the current loss

1    pick containment amount) was only 47.98%. Since this was lower than the initial 0.70 Pay-In

2    Factor, Prestige had expected that its premium payments would have been based on a percentage

3    lower than the initial 0.70 Pay In Factor.

4         24. However, by use of its unknown and unanticipated formulas for determining the

5    amounts Prestige was required to pay for the insurance - formulas that were not set forth clearly

6    in the RPA - the Applied Defendants were charging Prestige based on a loss ratio of 95%. This

7    resulted in Prestige owing under the contract $4,647,683, or just $969,963 short of their three-

8    year maximum liability of $5,617,646 with still a year to go under the program.

9         25. Anticipating the increases in the monthly charges became agonizing for Prestige, and

10   created unwarranted financial insecurity for the company, since it never knew how much Applied

11   was going to charge, how the calculations were going to be made and what factors Applied would

12   use in making these calculations.

13        26. As a consequence, Prestige refused to pay the amounts they were billed for the month

14   of November 2015. On December 17, 2015, Applied unilaterally sent Prestige a cancellation

15   notice which cancelled Prestige's insurance coverage effective January 2, 2016. A true and

16   correct copy of the December 17, 2015 Policy Termination/Cancellation/Reinstatement Notice is

17   attached hereto as Exhibit B, and by this reference is incorporated herein. In laymen's terms, this

18   meant that the EquityComp Program would remain in effect, however, Berkshire could, according

19   to the unconscionable terms of their Agreements, now calculate Prestige's charges by much

20   higher Loss Development Factors, and other multipliers not fully disclosed in the RPA. At the

21   time of the filing of this complaint, Prestige has yet to have received a dollar demand from

22   Applied as to its claims under the EquityComp program.

23            **FIRST CAUSE OF ACTION: DECLARATORY RELIEF AND RESCISSION**

24                   (Against the Applied Defendants and Does 1 through 50, inclusive)

25        27. Plaintiffs incorporates by this reference each and every allegation contained in

26   paragraphs 1 through 26 of this Complaint, as though fully set forth herein.

27        28. The Applied Defendants have sold an insurance policy in the State of California

28   without submitting the policy for approval from the California Insurance Commissioner or

the appropriate regulatory agencies of the States of New Jersey and New York. The filing requirement is relevant here because the RPA alters the payment requirements under the Continental policies. The Applied Defendants claim they are able to avoid the filing requirement by the conduct described in paragraph 22, *supra*.

29. As to California, Applied's sale of the RPA to Prestige in the State of California without the approval from the Commissioner is in violation of Cal. Ins. Code § 11658.

30. Because Applied has sold an unapproved policy to Prestige without the approval of the California Insurance Commissioner, or the regulatory agencies of New Jersey and New York, the Agreement is void.

31. Prestige is entitled to a declaration from this court that:

(a)     The Agreement is a retrospective rating insurance policy issued by Applied and alters the payment requirements under the Continental policies;

(b)     Because the RPA alters the payment requirements under the Continental policies, it is a collateral agreement which is required to be filed and approved by the appropriate regulatory agencies before it can be offered for sale;

(c)     Applied did not file the RPA or obtain the approval of the appropriate regulatory agencies of the RPA before it offered it to St. Cloud Capital and Prestige;

(d)     Applied is therefore is not qualified or authorized to sell the Policy and Agreement in the State of California by the Commissioner nor for use in New Jersey or New York without the approval of their regulatory agencies;

(d)     Applied Underwriters' solicitation of the Agreement, and collection of premiums and other assessments from Prestige under the Agreement are in violation of the various state's insurance codes;

(e)     The Agreement is void;

(f)     As a consequence of its violation of the California Insurance Code as provided for herein, Prestige is entitled to a return of premiums paid less any amounts paid for claims against the segregated account.

WHEREFORE, Plaintiff prays for judgment as hereinafter pled:

**SECOND CAUSE OF ACTION**

(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing - Against the Applied Defendants and Does 1 through 50, inclusive)

32. Plaintiff incorporates by this reference each and every allegation contained in paragraphs 1 through 31 of this Complaint, as though fully set forth herein.

33. The covenant of good faith and fair dealing is implied by law in every contract to protect each party's right to receive the benefits of the contract.

34. The implied covenant of good faith and fair dealing obligated the Applied Defendants to set premium rates and cancelation penalties fairly and take into consideration adequate and accurate reserves and paid losses; not to charge Plaintiffs a usurious or illegal penalty; not to misrepresent the nature or character of its proposed plan for providing coverage to the insured (i.e., as a profit-sharing plan); to give Plaintiffs reasonable notice and/or information concerning the anticipated monthly premium amounts, including the methods by which they are calculated; to give Plaintiffs requested information concerning the manner in which monthly premium amounts and/or nonrenewal penalties are calculated; and to comply with California, New Jersey and New York laws and regulations prohibiting illegal side agreements and governing the filing of rate plans.

35. The Applied Defendants' conduct, as alleged above and herein, has denied Plaintiffs the benefits of the workers' compensation policies they bargained for. Thus, the Applied Defendants have breached the implied covenant of good faith and fair dealing, by: (a) offering, presenting and executing illegal side agreements with Plaintiff; (b) willfully misleading Plaintiff concerning it future payment obligations; (c) refusing to provide Plaintiffs notice or information concerning how premiums would be calculated; (d) misrepresenting the RPA and the EquityComp Program as a profit-sharing plan; (e) charging an illegal non-renewal and/or cancellation fee; (t) refusing to comply with California, New Jersey and New York laws and regulations governing the filing of rate plans; (g) misrepresenting to Plaintiff the anticipated cost of the EquityComp Program; and (h) setting Plaintiff's premium rates unfairly and without taking into consideration actual reserved and paid losses.

36. Plaintiffs are informed and believe, and thereon allege, that the aforementioned conduct by the Applied Defendants constitutes a common pattern and practice.

37. Plaintiffs are informed and believe, and based on such information and belief allege, that the primary reasons why the Applied Defendants breached the implied covenant of good faith and fair dealing as outlined hereinabove, was to charge Plaintiff additional and unnecessary fees, costs, expenses and LDFs.

38. Plaintiffs are informed and believe, and based on such information and belief allege, that the Applied Defendants intentionally, maliciously, egregiously, and without remorse overcharged Plaintiff for no other purpose but to enrich the Applied Defendants.

39. Plaintiffs are informed and believe, and based on such information and belief allege, that there have been other acts and omissions by the Applied Defendants that violated the implied covenant of good faith and fair dealing implied in the workers' compensation policies, and that, though those other acts and omissions are currently unknown to Plaintiffs, they may discovered during the course of discovery in this litigation.

40. As a proximate result of the Applied Defendants' conduct, as alleged herein, Plaintiff has suffered both general and specific damages, as described herein. The Applied Defendants' conduct resulted in unnecessary and excessive fees, costs, and expenses. Further, the Applied Defendants' conduct has also increased Plaintiff's prior and subsequent premiums, and it has caused Plaintiff to hire outside consultants, experts, and attorneys to try to get the Applied Defendants to meet their obligations under the EquityComp Program and policies. Plaintiff is therefore entitled to collect all costs and expenses, including attorneys' fees incurred in seeking to obtain the benefits owed to them under the EquityComp Program.

41. Plaintiff alleges that the Applied Defendants' conduct, as alleged herein, was undertaken in bad faith, was malicious, fraudulent, and oppressive, evidence a complete disregard for Plaintiff's interests, and was intended to injure, harass, vex, and annoy Plaintiff. Thus, the Applied Defendants' conduct was "despicable conduct" as that term is defined in Civil Code section 3294 and under established common law, thereby entitling Plaintiff to recover punitive damages in an amount appropriate to punish, or to set an example of the Applied Defendants.

1    Plaintiff is further informed and believe and on such information and belief allege that what the

2    Applied Defendants did to Plaintiff, they have done to other similarly situated policyholders.

3    Indeed, Plaintiff is informed and believes and on such information and belief alleges that the

4    Applied Defendants have engaged in a pattern and a practice of manipulating reserves,

5    demanding excessive premium amounts on a short term basis and then imposing unconscionable

6    terms and promissory notes all of which amount to conduct that borders on a scheme and practice

7    to cause their own policyholders extreme economic hardship.

8                  WHEREFORE, Plaintiff prays for judgment as hereinafter pled:

9                                    **THIRD CAUSE OF ACTION**

10                  (Fraud and Misrepresentation - Against the Applied Defendants,

11                          Lockton and Does 1 through 50, inclusive)

12         42. Plaintiff incorporates by this reference each and every allegation contained in

13    paragraphs 1 through 41 of this Complaint, as though fully set forth herein. As to the Applied

14    Defendants only, this cause of action is pleaded in the alternative to the third cause of action for

15    fraud.

16         43. In presenting the RPA and the EquityComp Program to St. Cloud and Prestige, the

17    Applied Defendants, Lockton represented that the RPA and the EquityComp Program complied

18    with California, New Jersey and New York law, including the relevant applicable statutes and

19    regulations. Further, the Applied Defendants misrepresented the nature of the RPA and

20    EquityComp Program as a profit-sharing plan and that payments during the plan period would

21    reflect lower payments if losses were low.

22         44. In or about October, 2013, Lockton represented to St. Cloud and Prestige that he and

23    Lockton were sufficiently knowledgeable and qualified to assist St. Cloud and Prestige in

24    obtaining workers' compensation policies, and to advise St. Cloud and Prestige regarding such

25    coverage. More specifically, Lockton held itself to have specialized expertise in assisting and

26    advising clients, such as St. Cloud and Prestige in obtaining and maintaining workers'

27    compensation coverage.

28         45. Lockton told St. Cloud and Prestige that the EquityComp program offered lower rates

1    for Prestige to insure its workers' compensation liabilities than any other company and further

2    represented that the cost of such coverage would fall within a specified range.

3        46. At the time the Applied Defendants and Lockton made these representations, St.

4    Cloud and Prestige believed them to be true and, in reliance on them, and the expertise of

5    Lockton was induced to enter the EquityComp Program. Had St. Cloud and Prestige known the

6    full and complete facts, it would not have agreed to the EquityComp Program or to obtaining

7    coverage from the Applied Defendants.

8        47. These representations by the Applied Defendants and Lockton were false. At the time

9    of making them, these Defendants knew or should have known they were false. The true facts

10   were as follows: (a) the EquityComp Program was not, nor was it ever intended to be a "profit-

11   sharing" plan; (b) the premiums the Applied Defendants charged Prestige were constantly

12   increasing, and these Defendants knew or should have known that the premiums were, in fact,

13   higher than the premiums the Applied Defendants and Lockton represented as the applicable

14   range of premiums before the inception of the policy; (c) the RPA and the EquityComp Program

15   contained unfiled rate plans and illegal side agreements which violated California, New Jersey

16   and New York laws; (d) the RPA and the EquityComp Program had unforgiving and usurious

17   penalty provisions for cancellation and/or non-renewal; and (e) the RPA, the EquityComp

18   Program, and the Applied Defendants' workers' compensation policies were unfair, non-mutual,

19   and inequitable and imposed excessive premiums and penalties on insured.

20       48. At the time the Applied Defendants and Lockton made these misrepresentations or

21   omissions, they failed to act reasonably or exercise due care as to whether the representations

22   were true and were likely to induce St. Cloud and Prestige to act in reliance on the

23   misrepresentations or omissions by agreeing to the RP A and the EquityComp Program.

24       49. St. Cloud and Prestige reasonably relied upon these misrepresentations and omissions

25   by entering into the RPA and the EquityComp Program.

26       50. Prestige is informed and believes and thereon alleges that as a result Prestige incurred

27   costs, expenses, fees, and premiums far great than what it should have incurred under the

28   EquityComp Program.

51. As a proximate result of the Defendants' conduct, as alleged herein, Plaintiff has suffered both general and specific damages. The Defendants' conduct also resulted in unnecessary and excessive fees, costs, and expenses, and increased Plaintiff's premiums.

WHEREFORE, Plaintiff prays for judgment as hereinafter pled:

**FOURTH CAUSE OF ACTION**

(Professional Negligence - Against Lockton, and Does 1 through 50, inclusive)

52. Plaintiff incorporates by reference herein and realleges each and every allegation contained in Paragraphs 1 through 51 of this Complaint, as though fully set forth herein.

53. As St. Cloud and Prestige's insurance broker, Lockton owed St. Cloud and Prestige a duty of care in procuring its workers' compensation insurance coverage, in determining and ensuring that such coverage was appropriate for the type of business Prestige has been engaged in, and in providing professional advice to St. Cloud and Prestige concerning its rights and obligations in connection with its workers' compensation insurance coverage.

54. In or about October 2013, Lockton represented to St. Cloud and Prestige that it was sufficiently qualified and experienced to obtain workers' compensation insurance coverage for Prestige and could sufficiently advise St Cloud and Prestige on such policies, and Lockton held itself out as having specialized expertise in obtaining and advising on such workers' compensation coverage to insureds like Prestige. St. Cloud and Prestige relied upon Lockton's expertise by contracting with Lockton to procure workers' compensation for Prestige's business, and more specifically, in obtaining coverage for Prestige with the EquityComp Program, and in consulting with Lockton for its professional' advice regarding the EquityComp Program.

55. Lockton breached its professional duties to St. Cloud and Prestige in recommending the EquityComp Program to Prestige even though Lockton knew or should have known that the Applied Defendants' workers' compensation policies and the EquityComp Program were, or were likely to be unfair, non-mutual, unconscionable, and unreasonable, in bad faith and/or fraudulent.

56. Additionally, Lockton advised St. Cloud and Prestige that under the EquityComp Program its workers' compensation premiums would be within a specified range. However, Lockton was unable and/or refused to provide St. Cloud and Prestige with answers when Prestige

1    incurred increasingly higher premiums, and additional charges and requested explanations for the

2    increase of premiums and other charges.

3        57. Lockton's negligent procurement of insurance and its negligent professional advice has

4    damaged Prestige based upon the excessive and unlawful premiums the Applied Defendants

5    forced upon Prestige, the penalties and other fees the Applied Defendants charged Prestige,

6    requiring that Prestige bring this action and incur substantial expense to obtain an adjudication of

7    the correct amount, if any, that Prestige may owe the Applied Defendants. Thus, to the extent that

8    Prestige incurs defense and indemnity costs, Prestige alleges that Lockton is responsible for such

9    costs in addition to the damages caused by their professional negligence.

10       WHEREFORE, Plaintiff prays for judgment as follows:

11       **ON THE FIRST CAUSE OF ACTION**

12       1. For a declaration that the Reinsurance Participation Agreement is void and

13   unenforceable because it was required to be, and was not, filed and approved by the appropriate

14   insurance regulatory agencies;

15       2. For rescission of the RPA;

16       3. For general and special damages against the Applied Defendants and Does 1 through

17   50, inclusive, in a sum to be proven at trial, with pre-judgment and post-judgment interest thereon

18   at the maximum rate permitted by law;

19       **ON THE SECOND CAUSE OF ACTION**

20       1. For general and special damages against the Applied Defendants and Does 1 through

21   50, inclusive, in a sum to be proven at trial, with pre-judgment and post-judgment interest thereon

22   at the maximum rate permitted by law;

23       2. For punitive and exemplary damages, in amounts appropriate to punish, and to set

24   an example of the Applied Defendants and Does 1 through 50, inclusive;

25       3. For recovery of all attorneys' fees and consultants' fees, costs, and expenses;

26       **ON THE THIRD CAUSE OF ACTION**

27       1. For general and special damages against the Applied Defendants and Lockton and Does

28   1 through 50, inclusive, in a sum to be proven at trial, with pre-judgment and post-judgment

1    interest thereon at the maximum rate permitted by law;

2         2. For recovery of all attorneys' fees and consultants' fees, costs, and expenses;

3    **ON THE FOURTH CAUSE OF ACTION**

4    1. For actual and consequential damages from Lockton according to proof at trial;

5    2. For recover of attorneys' and consultants' fees, costs and expenses;

6    **ON ALL CAUSES OF ACTION**

7    For costs of suit; and

8    For such other and further relief as the court may deem proper.

9    **DEMAND FOR JURY TRIAL**

10    Plaintiff hereby demands a jury trial pursuant to FED. R. CIV. P. 8(b).

11    Dated:  February 10, 2016                    Lichtenegger Law Office

12                                                                *Larry J. Lichtenegger*

13                                                        _____

14                                                        Larry J. Lichtenegger
                                                            Attorney for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

**APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.**
**PARTICIPANT NO. 879320**
**REINSURANCE PARTICIPATION AGREEMENT**

This reinsurance participation agreement (this "Agreement") is made and entered into by and between Applied Underwriters Captive Risk Assurance Company, Inc., a company organized and existing under the laws of the State of Iowa ("Company") as of October 30, 2013 and
Prestige Industries, LLC ("Participant")

Company and Participant are each a "Party" and sometimes collectively referred to as "Parties".

Whereas, Participant is desirous of participating in the Company's segregated protected cell reinsurance program designated Segregated Account No. 879320 ("Participation"); and

Whereas, the Company has entered into a Reinsurance Treaty (hereinafter referred to as the "Treaty") with California Insurance Company (NAIC No. 0031-38865) and, through its pooling arrangement, with other affiliates of Applied Underwriters, Inc., including, but not limited to Continental Indemnity Company (NAIC No. 0031-28258) and Illinois Insurance Company (NAIC No. 0031-35246) (collectively the "Issuing Insurers"); and

Whereas, the Participant desires the Company to establish a segregated protected cell whereby the Participant may share in the underwriting results of the Workers' Compensation policies of insurance issued for the benefit of the Participant by the Issuing Insurers (the "Policies"); and

Whereas the Company will allocate a portion of the premium and losses under this Agreement to the Participant's segregated protected cell,

Now, therefore, in consideration of the mutual promises and undertakings set forth herein the Parties do hereby agree as follows:

1.      Participant agrees to participate in the Company's segregated protected cell reinsurance program in accordance with Schedule 1 attached hereto and incorporated herein by reference and additional Schedules as may be executed from time to time on a prospective basis only by the Parties ("Additional Schedules").

2.      Participant's interest in the Company is solely as a segregated protected "cell" with segregation of the Company's assets and liabilities among the segregated accounts (known as "cells") established by the Company. There is no "joint and several" liability. The cells of the Company are not liable for the debts and obligations and are not bound with respect to contracts entered into by another cell. Participant further acknowledges and agrees that Participant: (1) will look solely to the assets of Participant's cell for satisfaction of the Company's liabilities hereunder; (2) has had the opportunity to consult with legal counsel, insurance advisers and financial advisers as to the applicability, operation, obligations and effect of this Agreement; (3) irrevocably waives any right, substantive or procedural, which Participant may have to challenge the effectiveness and the Company's ability and right to segregate assets among the cells; and (4) covenants not to sue, attach, pursue or make any claim against or with respect to any asset, property or right of the Company which is not an asset, property or right of Participant's segregated protected cell.

3.      Participant is participating in this Agreement for purposes of investment only. The Participation has not been registered under the United States Securities Act of 1933, as amended or any state securities laws. The Participation shall not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered and Participant acknowledges the following:

"This Participation has not been registered under the Securities Act of 1933, as amended or qualified under any state securities law. This Participation has been acquired for investment and may not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered in the absence of registration or an exemption therefrom under such act and such laws."

© 2012, Applied Underwriters, Inc.

4.      This Agreement and any Schedules hereto represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior negotiations, proposals, letters of intent, correspondence and understandings relating to the subject matter hereof and may not be modified, amended or supplemented in any manner except in writing signed by the Parties hereto. If Participant has previously executed a Reinsurance Participation Agreement with Company (the "Prior Agreement") with accompanying Schedules (the "Prior Schedules"), this Agreement shall, to the extent of any conflict, supersede the Prior Agreement, but the Prior Schedules shall remain in full force and effect. The initial term of this Agreement (the "Active Term") is for three (3) years and may be extended from time to time by the Parties. All existing obligations from each Party to the other or to third Parties shall remain in force as of the expiration of the Active Term.

During the Active Term of this Agreement, Workers' Compensation Insurance coverage will be provided to Participant by one or more of the Issuing Insurers. If Participant elects to cancel this Agreement, or if any of the Policies are cancelled or non-renewed prior to the end of the Active Term ("Early Cancellation"), Early Cancellation terms set forth in Schedule 1 or any Additional Schedules shall apply.

If the Issuing Insurer is required to provide Workers' Compensation Insurance coverage on behalf of the Participant outside of the Active Term (the "Extension Period"), special extension terms ("Extension Terms") will apply during the Extension Period. The Extension Terms are: (1) Participant through their cell will be liable for all losses occurring during the Extension Period without limitation on any Policies issued by the Issuing Insurers on behalf of Participant; (2) the Company will allocate to Participant's cell an amount equal to 45% of premium during the Extension Period under any Policies issued by the Issuing Insurers on behalf of Participant; (3) Participant will immediately pay to the Company a cash deposit equal to 55% of the premium anticipated, as determined exclusively by the Company, during the Extension Period under any Policies issued by the Issuing Insurers on behalf of Participant; (4) Participant will maintain at all times a cash deposit with the Company sufficient to cover outstanding losses occurring during the Extension Period plus incurred but not reserved and/or reported losses (IBNR) as determined exclusively by the Company; and (5) Participant will immediately pay to the Company an Early Cancellation fee equal to 20% of the premium anticipated, as determined exclusively by the Company, during the Extension Period under Policies issued by the Issuing Insurers on behalf of Participant.

5.      Participant acknowledges that under the laws of some states, Participant may have the option to choose from various deductible amounts as a part of its Policies, but that opting for a deductible would preclude Participant from entering into this Agreement. Participant, being fully advised, knowingly waives and relinquishes its right to choose a deductible on the Policies under applicable law as further consideration for this Agreement.

6.      Participant may not assign or transfer its rights under this Agreement to any third party without the written consent of the Company which consent may be withheld in the Company's absolute discretion. This Agreement shall be binding upon and inure to the benefit, successors and assigns of each of the Parties.

7.      The Parties' obligations under this Agreement shall survive the Active Term of this Agreement, and shall only be extinguished when the Company no longer has any potential or actual liability to the Issuing Insurers with respect to the Policies reinsured by the Company under the Treaty as determined exclusively by the Company.

8.      Applied Risk Services, Inc. (Applied Risk Services of New York, Inc. in New York State) has been appointed the billing agent for the Company and the Issuing Insurers and is authorized by the Company, Issuing Insurers, and Participant to account for, offset and true up any and all amounts due each of the Parties and is authorized to collect any amounts due and owing under this Agreement. Participant will allow the Company to audit Participant's records on reasonable notice and during normal business hours that relate to the Policies. These records include, but are not limited to ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. Information developed by audit will be used to assign worker classifications, determine the compensability of payroll and claims, and determine final premium and cession amounts.

9.      In the event the Participant is in default of any obligations to the Company under this Agreement or under any other agreement with any affiliate of the Company (Affiliated Agreements), the Company may take all reasonable steps to protect its and its affiliates' interests. The Parties hereto shall have the right to the fullest extent provided by law to offset or recoup any balances due from one to the other under this Agreement or any Affiliated Agreements.

10.    In consideration of the mutual benefits arising under this Agreement, Participant hereby grants to Company, effective from and after the date hereof, a lien and security interest in all assets of Participant's cell to secure payment of any amounts owed by Participant under this Agreement. The provisions of this section shall create a security interest under the Uniform Commercial Code (the "Code") in the state of Participant's domiciliary jurisdiction so that Company shall have and may enforce a security interest on all of Participant's assets in Participant's cell. Participant agrees to execute any documents Company may reasonably request in order that Company's security interest can be protected pursuant to the Code.

11.    Participant represents and warrants to the Company as follows:

(A)    Participant (i) is duly organized, validly existing and in good standing under the laws of its domiciliary jurisdiction (if a corporation, partnership, or limited liability company), and (ii) has adequate power and authority and full legal right to carry on the businesses in which it is presently engaged and presently proposes to engage.

(B)    Participant has adequate power and authority and has full legal right (i) to enter into this Agreement and (ii) to perform all of its agreements and obligations under this Agreement.

(C)    The execution and delivery by Participant of this Agreement and the performance by Participant of all of its undertakings and obligations under this Agreement, including any payments required to be made by Participant to the Company under this Agreement, have been duly and properly authorized by all necessary action on the part of Participant, and do not and will not (a) contravene any provision of the charter or by-laws of Participant (if a corporation, partnership or limited liability company) or other constitutional or governing documentation of Participant (each as in effect on the date hereof), (b) conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, or (except as otherwise contemplated and required or permitted by this Agreement) result in the creation of any mortgage, lien, pledge, charge, security interest or other encumbrance upon any of the property of Participant under any agreement, trust deed, indenture, mortgage or other instrument to which Participant is a Party or by which Participant or its respective property is bound or affected on the date hereof, (c) violate or contravene any provision of any law or published regulation or any published order, ruling or interpretation thereunder or any decree, order or judgment of any court or governmental or regulatory authority, bureau, agency or official (all as in effect on the date hereof and applicable to Participant), (d) require any waivers, consents or approvals by any of the creditors or trustees for creditors of record of Participant, or (e) require any consents or approvals by any Participant (except such as have been duly obtained and are in full force and effect on the date hereof).

(D)    This Agreement, when executed and delivered, shall have been duly and properly executed and delivered by Participant.

(E)    The agreements and obligations of Participant contained in this Agreement constitute legal, valid and binding obligations of Participant, enforceable against Participant in accordance with their terms.

(F)    The information that has been and/or will be supplied to the Company by Participant or on Participant's behalf with respect to this Agreement is accurate and complete, and with respect to financial information, comports with generally accepted accounting principles.

12.    Participant acknowledges that the Company has not made, and does not make, any oral, written or other representations, whether explicit, implied or otherwise, upon which Participant may rely concerning any possible tax benefits that may be derived from this Agreement.  Participant further acknowledges that any tax liability resulting from this Agreement, including but not limited to any tax assessments or related examinations conducted by the Internal Revenue Service or other taxing authority, will be the sole responsibility of Participant.

13.    (A) This Agreement shall be governed by and construed in accordance with the internal laws of the State of Nebraska without giving effect to any choice or conflict of law provision or rule (whether of the State of Nebraska or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Nebraska.

(B)  ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF, RELATED TO OR BASED UPON THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MUST ONLY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF NEBRASKA,

IN EACH CASE LOCATED IN OMAHA AND THE COUNTY OF DOUGLAS, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJEC-TION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVO-CABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(C)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND ANY SUCH ACTION MAY ONLY BE BROUGHT IN THE PARTICIPANT'S INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PUR-PORTED CLASS OR REPRESENTATIVE PROCEEDING. EACH PARTY TO THIS AGREEMENT CERTIFIES AND AC-KNOWLEDGES THAT: (i) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (ii) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SEC-TION 13(C).

14.     Participant acknowledges and agrees that it will benefit from this Agreement and that a breach of the covenants herein would cause Company irreparable damage that may not adequately be compensated by monetary compensation. Accordingly, it is understood and agreed that in the event of any such breach or threat-ened breach of this Agreement, Company may apply to any federal or state court located in Omaha, Douglas County, Nebraska for, and shall be entitled to, injunctive relief from such court, without the requirement of posting a bond or proof of damages, designed to cure existing breaches and to prevent a future occurrence or threatened future occurrence of like breaches on the part of Participant. It is further understood and agreed that the remedies and recourses herein provided shall be in addition to, and not in lieu of any other remedy or recourse which is available to Company either at law or in equity in the absence of this Paragraph including without limitation the right to damages.

15.     All notices, requests, demands or other communications to the Company provided for herein shall be in writing, shall be delivered by hand, by first-class mail, postage prepaid, or by any form of commercial overnight courier, or sent by facsimile or e-mail during normal business hours which shall be deemed given upon receipt of any automatic answer-back, read receipt or other similar evidence of transmission thereof, and shall be addressed to the Parties hereto at their respective addresses listed below or to such other persons or addresses as the relevant Party shall designate as to itself from time to time in a writing delivered in like manner to Applied Underwriters Captive Risk Assurance Company, Inc., P.O. Box 3646, Omaha, NE 68103-0646 and to Participant at:

Prestige Industries, LLC
1099 Wall Street W
#100
Lyndhurst, NJ 07071

Either Party may designate a new address for notices by providing written notice to the other Party as provided in this paragraph, or in the absence of such notification from Participant, at the address to which Participant's last billing statement was sent.

16.     All amounts referred to herein are expressed in United States Dollars and all payments shall be made in such dollars.

17.     Participation by Participant in this Agreement is subject to the prior written consent of the Com-pany. This Agreement is for the sole benefit of the Parties and nothing in this Agreement, expressed or implied, is intended to confer upon any Party, other than the Parties hereto and their affiliates, successors and permitted assigns, any legal or equitable rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

18.     Any term or provision of this Agreement which is held to be invalid or unenforceable, shall not render invalid or unenforceable the remaining terms and provisions of this Agreement.

19.     No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver whether of a similar or different character, and whether occurring before or after the waiver. No failure to exercise or delay in exercising any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

20.     This Agreement shall not be valid and effective unless and until the official seal of the Company is affixed and the Agreement executed by an officer of the Company.

IN WITNESS WHEREOF, the Parties have set their hand.

Prestige Industries, LLC

By:     _____

Name:   _Sang Cho_____

Title:  _President - member_____

Date:   _10/30/13_____

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC., SOLELY FOR AND
ON BEHALF OF PROTECTED CELL NO. 879320

**Travis J. Koch**
**Assistant Secretary**

_____

SCHEDULE 1 IMMEDIATELY FOLLOWS BEGINNING ON THE NEXT PAGE.

**APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.**
**PARTICIPANT NO. 879320**
**REINSURANCE PARTICIPATION AGREEMENT**
**SCHEDULE 1**
**EFFECTIVE DATE: OCTOBER 30, 2013**

This Schedule 1 applies as of the Effective Date to all payroll, premium, and losses occurring under the Policies notwith-standing any Extension Terms which may apply ("Effective Period"). For purposes of this Schedule 1, unless otherwise noted, capitalized terms shall have the meaning set forth in the Reinsurance Participation Agreement (the "Agreement").

1. Calculation of Premium and Loss Amounts.

(a) Policy Payroll is defined as compensable payroll occurring during the Effective Period under the Policies subject to all customary limitations and caps. The Loss Pick Containment Amount is defined as the amount equal to the product of Policy Payroll and the respective Loss Pick Containment Rates listed in the attached Table C. These rates are per $100 of Policy Payroll and are fixed for the Effective Period. Changes in experience modifiers and other modification or differential factors of the Policies will not affect these rates. If Policy Payroll occurs under a classification not listed herein, the Company shall, in its sole discretion, determine a rate for that classification commensurate with the rates otherwise listed and with the filed and approved rates of the Issuing Insurers.

(b) The Company will calculate loss development factors ("LDF's") for each loss under the Policies directly from the loss development factors published by the government rating bureau in the state where the exposure occurred. LDF's are subject to change without notice. The LDF's in effect as of the date of this Schedule 1 are listed in the attached Table A (a composite using Policy Payroll by state is shown). If during the Active Term the Participant: i) is processing payroll with an affiliate of the Company, the LDF's titled "Weekly" will be used; or ii) is not processing payroll with an affiliate of the Company, the LDF's titled "Monthly" will be used. Unless an agreement for renewal is offered by an affiliate of the Company and then accepted by the Participant within six (6) months of the end of the Active Term, the LDF's titled "Run-Off" will be used. In determining the age of a claim, the Company in its sole discretion will use either the date of occurrence or the date the claim was reported. For so long as the Participant provides a claimant with modified duty employment that accommodates medical work restrictions, at a wage sufficient to make the claimant ineligible for workers' compensation disability benefits, the amount of the LDF for that claim in excess of one (1) shall be reduced by the Modified Duty Reduction Factor shown below in the attached Table A.

(c) Ultimate Loss is defined as aggregate incurred losses under the Policies multiplied by the applicable LDF. The Loss Ratio equals Ultimate Loss divided by the Loss Pick Containment Amount.

(d) The Exposure Group Adjustment Factor is determined from the attached Table B using the Loss Ratio with interme-diate values to be interpolated. The Exposure Group Adjustment Factor has been determined using NCCI Expected Unlimited Loss Group 25 and is subject to change without notice i) if Policy Payroll varies from estimates made in preparing this Schedule 1; ii) if NCCI Table M is revised; or iii) to adjust for inflation or a change in claim severity not accounted for by Table M.

2. Allocation of Premium and Losses.

An amount equal to the premium earned under the Policies in excess of the Loss Pick Containment Amount multiplied by the applicable Exposure Group Adjustment Factor multiplied by the Allocation Factor listed in the attached Table B, will be allocated to the Participant's cell. Fees for services charged by any affiliate of the Company are not considered premium under the Policies.

The Participant, through its cell account, will be responsible for an amount equal to all losses under the Policies in aggregate up to the Cumulative Aggregate Limit which equals 0.9400 multiplied by the Loss Pick Containment Amount. During the Active Term, Participant's liability limits will be estimated quarterly in advance.

3. Capital Deposits. Participant agrees to make and maintain a capital deposit in its cell equal to the Estimated Annual Loss Pick Containment Amount shown in Table C multiplied by 10% during year 1; 10% during year 2; and 10% thereafter. The Estimated Annual Loss Pick Containment Amount and the resulting capital deposit are subject to change in the Company's sole discretion if Policy Payroll varies from estimates made as of the Effective Date of this Schedule 1.

4. Additional Capital Deposits. Participant further agrees to make and maintain in its cell account an additional capital deposit equal to the lesser of Ultimate Loss or the Cumulative Aggregate Limit. For the purposes of calculating the additional capital deposit, a Loss Ratio of no less than 65% will be used in year 1; 40% in year 2; and 30% thereafter. During the Run-Off Term, capital deposits will be calculated using the LDF's titled "Run-Off" at a schedule exclusively determined by the Company but no less frequently than annually.

5. Notwithstanding anything to the contrary in the Agreement, the Company may terminate the Agreement and liquidate the cell in its sole discretion if i) all claims under the Policies are closed and three years have elapsed since the expiration of all of the Policies; or ii) the Participant's maximum liability has been reached and three years have elapsed since the expiration of all of the Policies; or iii) the amount of paid losses allocated to the cell under the Policies has exceeded the Participant's maximum liability; or iv) seven years have elapsed since the expiration of all of the Policies; or v) the Company deems itself insecure with respect to Participant's ability or willingness to fulfill its obligations under this Agreement.

6. In the event of Early Cancellation whether by the Participant or by the Company (limited to non-pay or a material change in risk): (a) the Exposure Group Adjustment Factor will be multiplied by 1.25; (b) the Cumulative Aggregate Limit will be determined using Policy Payroll annualized to reflect the full term of the Agreement; and (c) the following amounts will be immediately due and payable to the Company: i) any remaining premium, including short rate penalties, due under the Policies; ii) a capital deposit equal to the cell's maximum liability; and iii) a Cancellation Fee equal to 8% of the Estimated Annual Loss Pick Containment Amount.

7. In the event of any conflict between the Agreement and this Schedule 1, this Schedule 1 shall control.

8. This Schedule 1 shall not be valid and effective unless and until executed by an officer of the Company and the official seal of the Company is affixed.

Prestige Industries, LLC

By: _____

Name: _____Sang Cho_____

Title: ___President - Member___

Date: ___10/30/13___

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC., SOLELY FOR AND
ON BEHALF OF PROTECTED CELL NO. 879320

**Travis J. Koch**
**Assistant Secretary**

_____

APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.
PARTICIPANT NO. 879320
REINSURANCE PARTICIPATION AGREEMENT
SCHEDULE 1 TABLES
EFFECTIVE DATE: OCTOBER 30, 2013

### TABLE A
#### Loss Development Factors

| Claim Age | | Weekly | | Monthly | | Run-Off | |
|---|---|---|---|---|---|---|---|
| Month From | Month To | Open Claims | Closed Claims | Open Claims | Closed Claims | Open Claims | Closed Claims |
| 00 | 06 | 2.386 | 1.232 | 2.434 | 1.257 | 3.658 | 1.201 |
| 07 | 09 | 2.357 | 1.151 | 2.405 | 1.175 | 3.658 | 1.201 |
| 10 | 12 | 2.339 | 1.101 | 2.385 | 1.123 | 3.658 | 1.201 |
| 13 | 15 | 2.320 | 1.084 | 2.366 | 1.106 | 3.469 | 1.111 |
| 16 | 18 | 2.301 | 1.078 | 2.348 | 1.099 | 3.469 | 1.111 |
| 19 | 21 | 2.274 | 1.069 | 2.319 | 1.090 | 3.469 | 1.111 |
| 22 | 24 | 2.241 | 1.055 | 2.286 | 1.077 | 3.469 | 1.111 |
| 25 | 27 | 2.210 | 1.046 | 2.254 | 1.067 | 3.272 | 1.064 |
| 28 | 30 | 2.179 | 1.044 | 2.222 | 1.065 | 3.272 | 1.064 |
| 31 | 33 | 2.157 | 1.040 | 2.200 | 1.060 | 3.272 | 1.064 |
| 34 | 36 | 2.139 | 1.032 | 2.182 | 1.053 | 3.272 | 1.064 |

The Modified Duty Reduction Factor is 25%.

### TABLE B
#### Exposure Group Adjustment Factors

| Loss Ratio | Adjustment Factor | Loss Ratio | Adjustment Factor |
|---|---|---|---|
| 0.00 | 1.0000 | 1.00 | 0.9666 |
| 0.10 | 1.4548 | 1.10 | 0.9666 |
| 0.20 | 1.6168 | 1.20 | 0.9848 |
| 0.30 | 1.5060 | 1.30 | 0.9848 |
| 0.40 | 1.3586 | 1.40 | 0.9848 |
| 0.50 | 1.2112 | 1.50 | 0.9848 |
| 0.60 | 1.0635 | 1.60 | 0.9848 |
| 0.70 | 0.9900 | 1.70 | 0.9848 |
| 0.80 | 1.1744 | 1.80 | 0.9848 |
| 0.90 | 1.0822 | 1.90 | 0.9848 |

The Allocation Factor is 0.35.

Ver. aco_5120_2a

**APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.**
**PARTICIPANT NO. 879320**
**REINSURANCE PARTICIPATION AGREEMENT**
**SCHEDULE 1 TABLES**
**EFFECTIVE DATE: OCTOBER 30, 2013**

TABLE C
Loss Pick Containment Rates and Estimated Annual Amounts

| Class Code | Loss Pick Containment Rate | Estimated Annual Payroll |
|---|---|---|
| NJ 2585 | 12.06 | 9,860,875 |
| NJ 8810 | 0.34 | 2,935,125 |
| NY 2591 | 9.41 | 2,504,500 |
| NJ 8742 | 0.86 | 504,000 |
| NY 8810 | 0.39 | 295,500 |

The Total Estimated Annual Loss Pick Containment Amount is $1,440,422.

EXHIBIT B



**APPLIED**
**UNDERWRITERS**
PO Box 3646 OMAHA, NE 68103-0646

December 17, 2015

Sang Cho
Prestige Industries, LLC
1099 Wall St W, #100
Lyndhurst, NJ 07071-3636

FAX: (201)935-2605

**Fax and Certified Letter**

<u>IMPORTANT NOTICE</u>

RE: Reinsurance Participation Agreement Including Workers' Compensation Policy

| <u>Policy Number</u> | <u>Policy Effective Date</u> | <u>Policy Expiration Date</u> |
|---|---|---|
| 73-879320-01-03 | 10/30/2015 | 10/30/2016 |

Please see the attached important documentation advising that your Reinsurance Participation Agreement and all insurance coverages, including but not limited to workers' compensation coverage, will be Cancelled effective 12:01 a.m. Eastern standard time on January 02, 2016, and the reason therefore. We urge you to carefully review this letter and the attached documents as this matter is time sensitive and requires your immediate attention.

We will review your account for possible reinstatement if all outstanding issues are satisfactorily resolved prior to the scheduled termination date.

As a result of this cancellation, we are reviewing your account to determine any and all amounts due and owing, and will provide you a final statement and supporting documentation as soon as that review is complete.

Should you have any questions, please contact your account manager at (877) 234-4420. We appreciate your prompt attention to this matter.

Thank you,

Underwriting Control Unit

CC Via Fax:          Lockton Insurance Brokers
                     FAX: (213)689-0550

Enclosures:          Endorsement WC 89 06 09 C

This notice supercedes any prior Notice of Cancellation/Non-renewal/
Rescission/Reinstatement that you may have received.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**     **WC 89 06 09 C**

## POLICY TERMINATION/CANCELLATION/REINSTATEMENT NOTICE

Carrier Name/NCCI Carrier Code   Continental Indemnity Company/28282

Insured's Name  Prestige Industries, LLC

Federal ID No.   454283213

Insured's Address  1099 Wall St W

　　　　　　　#100, Lyndhurst, NJ 07071-3636

| Policy Number | Policy Effective Date | Policy Expiration Date |
|---|---|---|
| 73-879320-01-03 | 10/30/15 | 10/30/16 |

___X___ **Termination/Cancellation/Nonrenewal**
The coverage provided by the policy number shown above is being _____ nonrenewed or ___X___ terminated/cancelled,____ flat,_X_ pro rata, or____ short rate, effective_01/02/16_ 12:01 a.m. standard time at the insured's mailing address for the following reason(s):
　　　Nonpayment of Premium

_____ **Reinstatement**
The coverage provided by the policy number shown above and previously nonrenewed, canceled or scheduled for cancellation is being reinstated effective_____12:01 a.m. standard time at the insured's mailing address.

Issue Date  12/17/15

Issuing Office  Omaha, NE

Producer's Name  Applied Risk Services, Inc.

Date Stamp
(For NCCI use only):